NYE ET AL., APPELLEES, *v.* SCHWAB ET AL., APPELLANTS.

(Decided February 13, 1937.)

*Mr. Stephen F. Perry,* for appellees.
*Mr. William T. Arnos,* for appellants.

Nichols, J.   Fred Nye and Dora Nye filed their petition in the Common Pleas Court of Ashtabula county against Christian Schwab and others, praying judgment against Christian Schwab and Lena Schwab in the sum of $3,608.45 with interest at the rate of 7% per annum, payable semi-annually, upon a promissory note executed and delivered to plaintiffs by Christian Schwab and Lena Schwab on the fifteenth of January, 1927, and praying for foreclosure of a certain mortgage given as security for the note.

Christian Schwab and Lena Schwab filed the following answer to the petition of plaintiffs:

"Now come Christian Schwab and Lena Schwab, defendants herein, and for their answer to the first cause of action set forth in plaintiff's petition admit the execution and delivery of the promissory note and endorsements thereon as alleged, but say they paid $200 additional on principal in 1932 and claim additional credit is due, and deny each and every other allegation therein set forth, and for their answer to the second cause of action admit the execution, delivery and recording of the mortgage as alleged, and deny each and every other allegation therein set forth.

"Second Cause of Defense.

"For their second cause of defense defendants adopt all the averments of the foregoing answer and make them a part hereof as if repeated here, and say further that they are entitled to a counterclaim; that the Federal Reserve Acts passed by the Congress of the United States imposed upon the Federal Reserve Banking System the sovereign function of maintaining a state of trade and business for the preservation of a

stable, average commodity price level, and the soundness of assets.

"Defendants say that said the Federal Reserve Banks, on the 18th day of May, 1920, and at various other times subsequent to January 5th, 1927, did ignore said Federal Reserve Act, and did scorn said public purpose for which said Federal Reserve Bank System was created, and did secretly, corruptly, and unlawfully fluctuate the volume of money in America and thereby reduced the amount of wages and the value of lands, buildings, and other articles possessing economic utility, against public welfare and especially against the debtor class, and for the special purpose of enabling money lenders to recover more than the principal sum of loans and the prescribed interest, and to camouflage and conceal the usurious character of debt collection contrary to the usury laws of the state of Ohio as well as the Federal Reserve Acts.

"The defendants say that the intrinsic worth of their farm, which is the property described in the plaintiff's petition, was $10,000 in 1927, and that its real value is equal to its 1927 value; that it consists of about fifty acres of land in a high state of cultivation with valuable growing crops thereon, and of a large house and barn and other buildings in excellent condition; that it is located in the East North Central Geographic Division of the United States, and that construction of residential buildings in the East North Central Geographic Division of the United States increased 642% in 1935 over 1934; that in all other geographic divisions in the United States of America the percentage of increase for 1935 over 1934, in new residential construction, ranged from 47% to 862%; that there exists in the banking system more than two billion dollars in excess reserve money which invests the banking system with potential lending power of twenty billion dollars; that such potential power is greater

than has heretofore existed in the United States; that the banking system will loan twenty billion dollars for construction and other purposes, and thereby expand the volume of credit and legal tender money twenty billion dollars over and above the existing volume, and that such expansion of the volume of the circulating medium of exchange will cause the prices of all commodities, land and buildings in the United States to rise; that the price of the defendant's home property will rise to the 1927 value; that on May 12, 1933, the 73d Congress passed an act intended to correct the evils arising from monetary stringency and for relief of debtors, by authorizing the President of the United States, *inter alia,* to reduce the content of the gold dollar to not below 50% and not to above 60%; that on January 31, 1934, the President of the United States pursuant to said Act of Congress and to cooperate with the Congress to provide relief from monetary stringency issued a proclamation and established 15 5/21 grains of sequestered gold bullion 9/10 fine as the standard, unit and measure of value abrogating the standard of weight containing 25.8 grains of coined gold 9/10 fine adopted by Congress on March 14, 1900, and that on the 1st day of February, 1934, the uncoined measure of value, 15 5/21 grains of sequestered gold bullion 9/10 fine became the standard, the unit, and the measure of value, and at all times thereafter and now is the standard, unit and measure of value and that the aforesaid act of the 73d Congress (C. 25, 48 U. S. Stat. 51-53 Title III) provides that all forms of money in circulation shall be maintained at a parity with the aforesaid new standard of value and that it shall be the duty of the Secretary of the United States Treasury to establish and maintain such parity. Defendant says that all money in circulation remains on a disparity, and is now on a disparity above the value of said new standard, unit and measure of value; and

that said disparity does now exist and is maintained contrary to law, against public welfare and especially against the rights of these defendants; and that because of such systemic fluctuation, and in spite of such relief measures, the purchasing power of 15 5/21 grains of gold, vested in the paper dollar in circulation, in 1936 is 127 cents; that a true comparative value of 1936 money with that of 1927 is as 15 5/21 grs.: 25.8 grs. :: 127 cents : $104.8 = \dfrac{3276.6}{1596.95}$. The true and comparative price of land for the identical years is as $25.8 : 15\,5/21 :: 104.8 : 127 = \dfrac{1596.95}{3276.6}$. Defendants say the amount of their counterclaim is equivalent to such disparity.

"Wherefore defendants pray that if a judgment be rendered and an order of sale be issued herein, that the debt may be measured by said new standard of value; that the sheriff may be ordered to authorize an appraisal of defendants' property in money at its true and comparative value in 1927, and for such other and further relief as the nature of the case may demand."

To the first defense of the answer the plaintiffs, by way of reply, denied that defendants paid $200 additional on principal in 1932, and denied that additional credit in that amount was due.

The plaintiffs filed their general demurrer to the "second cause of defense" of the answer, which demurrer was sustained by the trial court, and the defendants not desiring to plead further, final judgment was rendered in favor of plaintiffs and against defendants on the issue sought to be raised by the second cause of defense, and thereafter the issue on the first defense was tried and determined in favor of plaintiffs

and final judgment rendered against defendants for the amount found due upon the note and mortgage set up in the petition.

The sole question here is whether the allegations of the "second cause of defense" are sufficient to constitute a defense or to entitle defendants to any relief prayed for. For the purpose of the demurrer we are required, of course, to consider as true all of the well-pleaded, material allegations of the second cause of defense in the answer. We have diligently applied ourselves to the task of determining just what, if any, allegations are contained therein which are material as defensive to the petition of plaintiffs, or as entitling defendants to any relief prayed for therein. Apparently there is an attempt to set up a claim of usury in the transaction between plaintiffs and defendants wherein plaintiffs loaned to the defendants a certain sum of money in the year 1927, taking the promissory note of the defendants for the amount of money loaned and taking the mortgage of the defendants upon real estate owned by them as security therefor. There is no allegation that the defendants did not receive from the plaintiffs in 1927, in exchange for their note and mortgage, the exact number of dollars called for in the note of the true value of such dollars in 1927; but the answer attempts to assert that by reason of certain legislation passed by the Congress of the United States in the year 1933, the defendants should be permitted to pay the balance due upon their promissory note in dollars of the value of 59¢ and that the right to so pay the same has been thwarted by the wrongful and illegal acts of the Federal Reserve Banking System, it being the claim, as we understand it, that the Federal Reserve Banking System by its illegal and wrongful acts has brought to naught the efforts of the President and Congress of the United States to relieve debtors by allowing debtors to liquidate their obliga-

tions in dollars of 59¢ value. The act of May 12, 1933, 48 Stats. at L., 31, is relied upon. It reads in part (page 52) as follows:

"The President is authorized * * * by proclamation to fix the weight of the gold dollar * * * and such gold dollar, the weight of which is so fixed, shall be the standard unit of value, and all forms of money issued or coined by the United States shall be maintained at parity with this standard * * *."

It may be properly conceded that this act of Congress did authorize the President to fix the weight of the gold dollar and that thereunder the President has established 15 5/21 grains of sequestered gold bullion 9/10 fine as the standard unit of value, abrogating the former standard of weight, containing 25.8 grains of gold coin 9/10 fine, adopted by Congress on March 14, 1900. But the difficulty encountered in this legislation lies in the attempt of the Congress to establish that all forms of money issued or coined by the United States shall be *maintained at parity* with this standard. Certainly it can not by the greatest stretch of the imagination be claimed that the duty of maintaining this parity devolved upon plaintiffs or that the plaintiffs in this case have done or suffered any act which has prevented the maintenance of our present currency at the parity contemplated by the act.

The allegation of this defense in the answer is that the federal reserve acts passed by the Congress of the United States imposed upon the Federal Banking System the sovereign function of maintaining a state of trade and business for the preservation of a stable, average commodity price level, and the soundness of assets; that the Federal Reserve Banks ignored such Federal Reserve Act and the purpose for which the system was created, and secretly, corruptly, and unlawfully fluctuated the volume of money in America for the special purpose of enabling money lenders to

recover more than the principal sum of loans and the prescribed interest, and to camouflage and conceal the usurious character of debt collection. The allegation is the conclusion of the pleader but, assuming it to be true as alleged, it is difficult to see how the plaintiffs in this case were bound by the acts secretly done by the Federal Reserve Board, the purpose of which acts was camouflaged and concealed by the board.

It seems clear that one owing a debt can not defend against payment of the same on the ground of usury unless the person to whom the obligation is made payable has himself, as a part of the transaction, in one form or another, obligated the debtor to pay more than the true value of the property loaned with legal interest.

The answer does not set up facts alleging that in the transaction giving rise to the execution of the note and mortgage the defendants were required by plaintiffs to execute and deliver their note and mortgage in an amount greater than the true value of the debt owing by them or the property received by them from the plaintiffs at the time.

The allegations of the answer clearly state, we think, that the duty of maintaining all forms of currency at a parity with the new standard of value fixed by the President under the act of Congress is vested in the Secretary of the United States Treasury. The allegation that the Secretary of the Treasury has failed in his duty to maintain the parity of currency with the standard fixed therefor can not be ascribed as an act of usury upon the plaintiffs in this case. Indeed, it may well be doubted whether any legislative enactment of Congress or act of the President thereunder can effectually make possible the performance by the Secretary of the Treasury of the duty of maintaining currency upon a parity with an arbitrary gold content of the dollar.

It seems apparent that Congress may pass laws and the President act pursuant to the powers vested in him thereby, but that material forces over which Congress and the President have no control may operate to prevent the salutary purposes thereof. The real value of money is always equivalent to its purchasing power, and, its purchasing power being dependent upon the law of supply and demand, it follows that money can never remain upon a parity with anything because supply and demand are not fixed and unchangeable, but are variable. The act must be construed reasonably with a view to its practical operation as affected by the law of supply and demand, being factors entering into every computation of the purchasing power of money. That the President and Congress realized the difficulty in maintaining the parity of currency with the gold standard established is made apparent by an examination of Public Resolution Number 10, 73d Congress, approved June 5, 1933 (48 Stats. at L., 112, c. 48), which reads as follows:

"Whereas the holding of or dealing in gold affect the public interest, and are therefore subject to proper regulation and restriction; and

"Whereas the existing emergency has disclosed that provisions of obligations which purport to give the obligee a right to require payment in gold or a particular kind of coin or currency of the United States, or in an amount in money of the United States measured thereby, obstruct the power of the Congress to regulate the value of the money of the United States, and are inconsistent with the declared policy of the Congress to maintain at all times the equal power of every dollar, coined or issued by the United States, in the markets and in the payment of debts. Now, therefore, be it

"Resolved by the Senate and House of Representatives of the United States of America in Congress as-

sembled, That (a) every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby, is declared to be against public policy; and no such provision shall be contained in or made with respect to any obligation hereafter incurred. *Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts.*" (Italics ours.)

Thus, the full purpose of the acts of Congress as well as the acts of the President in fixing the gold content of the dollar and providing for the maintenance thereof at parity with the standard fixed is shown to be to the end only that every obligation heretofore or hereafter incurred, any provision therein to the contrary notwithstanding, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts. This positive provision of the law is operative not only to prevent the creditor from demanding money of a different value, measured by its gold content, from that fixed by the presidential order under the act of Congress, but is equally operative upon every debtor and requires such debtor to discharge his obligation, dollar for dollar, in the coin or currency which, at the time of payment, is legal tender for public and private debts. Any other construction of the law would result in an unequal application thereof and destroy its uniform operation, thereby rendering the law unconstitutional. The acts in question have been declared by the highest court in the land not to be in conflict with the Constitution of the United States.

The allegations of the answer as to the intrinsic value of the defendants' farm in 1927 and that its real value now is equal to its 1927 value are not material as a defense for the reason that plaintiffs' action is not for the recovery of the purchase price of land sold by plaintiffs to defendants at an exorbitant price because of the necessity of the defendants, nor does the answer claim that such is the situation. This defense of the answer does not set up a failure of consideration for the note executed by defendants to plaintiffs, nor is there any allegation in the answer that the mortgage was given other than as security for the payment of the note. It follows that if by some act or acts of the Federal Reserve Bank, or the failure of the Treasurer of the United States to perform the duties alleged to have devolved upon him, whereby the security given by defendants to plaintiffs for the money received by defendants from plaintiffs will not now sell in the market for the price at which these premises would have sold had the Treasurer of the United States fully performed his duties and the Federal Reserve Bank had not committed the secret and corrupt acts alleged, the plaintiffs have been as much injured as the defendants. The defendants are still permitted to pay the debt with the 59¢ dollar established by the President; whereas the defendants received the amount of the note in dollars of 100¢ value. If anyone is to complain of this special privilege allowed to the debtor, it is the plaintiffs in this case and not the defendants. Only in the event that the defendants fail to pay the amount found due upon the note by a day certain to be fixed by the court and in dollars now declared by Congress as legal tender for the payment of public and private debts will defendants' real estate be sold.

The prayer of this part of the answer of defendants contains the request that the appraisers fix the value of the mortgaged premises in a manner or upon a basis

contrary to the provisions of the code of Ohio regulating the appraisement and sale of lands upon foreclosure. The provisions of the General Code are mandatory, and before the court may confirm the sale it must be shown that the requirements of the code have been complied with.

We have arrived at the conclusion that the second cause of defense in the answer of defendants contains no allegation constituting a defense to the causes of action set forth in plaintiffs' petition, or either of them, and that the Common Pleas Court did not err in sustaining the demurrer thereto.

It is the further finding of this court that the appeal upon questions of law prosecuted by the defendants is without merit and that there is no reasonable cause for appeal. It is the order and judgment of this court that the judgment of the Common Pleas Court be and the same is hereby affirmed, and that $25 additional be taxed in the costs as fee for counsel for appellees in accordance with the provisions of Section 12223-36, General Code.

Judgment affirmed and $25 additional taxed as a part of the costs as fee for counsel for appellees.

*Judgment affirmed.*

ROBERTS, P. J., and CARTER, J., concur.